Good morning. Have a seat. Could we call the final case of the day, please? Bosch v. NorthShore. Will the attorneys presenting argument please approach, introduce yourselves, spell your names for the record. Good morning, Your Honor. Joseph Selka, S-E-L-B-S-H-O-I-K-A, on behalf of Brandon Bosch. Okay. Good morning, Your Honor. Jason Parson, J-A-S-O-N-P-A-R-S-O-N, on behalf of NorthShore University Health System, Tracy Felt and Julia Fesko. Okay. Good morning. Good morning, Your Honor. Karen Cortu, that's C-O-U-R-T-H-E-O-U-X, on behalf of DePaul University. Good morning. We typically give 15 minutes to a side. Does NorthShore and DePaul want to divide this up in some way? It was our expectation that we would attempt to divide our time evenly. Okay. However you want to do it is fine with us. We'll try to split that. And we can be a little flexible with the time. Mr. Selka, I assume you want to reserve a few minutes for rebuttal as well. I would, Your Honor. I would like to reserve three minutes. That's fine. Yeah. We can give you something like that. Okay. Justice Cobbs, unfortunately, had a death in the family, and so she's not here. She will be listening to the arguments, and she has already participated to some extent. So I apologize that she keeps you stuck with Justice Cobbs tonight. Mr. Selka, you have the floor. Thank you. If I may please the Court, this case concerns the dismissal of a graduate student from a doctoral program of nurse anesthesia. The program was run jointly by NorthShore Health System and DePaul University. I'll refer to them as the institutional defendants moving forward. The two other defendants were preceptors who evaluated Mr. Bosch in his last class, which was practicum three. It's referred to in the brief. It was his last clinical rotation. He had passed all other classroom classes as well as all other clinical rotations and then was dismissed from the program because he was dismissed out of practicum three. Mr. Bosch sued, and by the end of the case, there were four theories. The one that was argued the most that I'll address first is a breach of implied contract. Illinois courts and courts generally have allowed for breaches of implied contract cases, for breaches of tuition contracts for graduate students. And in this case, there are three interrelated bases which we pleaded which demonstrates a breach of contract. The first is that NorthShore, the institutional defendants, failed to evaluate Mr. Bosch according to their own published procedures as set forth in the accreditation standards, which I'll refer to as the counsel standards, which they were bound to and which they published. Is it your position you're talking about the counsel standards? Yes, sir. Is it your position that everything in those counsel standards, I think it's about 40 pages, right? Everything in there is an enforceable promise? To the extent they are enforceable promises, yes. To the extent that they have been published by NorthShore and the institutional defendants, to the extent the institutional defendants state that they are going to comply and publish that they are going to comply with these accreditation standards, these counsel standards, then yes, they are all... So the institutional defendants say that they are accredited, and that's a true statement, right? Yes. That's not false, okay? And then they say we comply with those standards. Yes. Is that different than saying we're accredited? Is that going a step beyond that and saying we will comply with everything that you find, page 1 through 40? No. I think if you say you're accredited, by implication you say you're following these counsel and accreditation standards by which you became accredited and by which the institutional defendants agreed to operate their expeditions. Does the counsel itself require that you satisfy every one of those standards? Don't they contain language to the effect of we, you know, some of these things we've marked with an asterisk which are particularly important, but even the failure to satisfy some of those asterisk ones, the really important ones, are of critical concern in evaluation whether you're going to be accredited, right? It's not as if there's, you know, 150 standards and if you miss one, you're out. It's something where they take everything into account and decide whether overall in their subjective determination you make the grade, right? For their accreditation, yes. However, these counsel standards require that they publish that they complied by these standards and these standards say that they gave rights and responsibilities to all of the stakeholders, including the students. So regardless of whether the agency would consider imposing a death penalty and refusing to accredit, these are still published contractual promises to the student which grants the student rights because the documents published by a university are part of the implied contract between the university, in this case the universities, and the student as a matter of law and they are enforced. Did the institutional defendants publish these standards? We pleaded that they did. You did? Yes. You pleaded that they published these? Yes. I mean, I don't have every detail. It's a long complaint. You talk about the fact that they said that they're accredited, which as far as I can tell was an accurate statement and that they comply with the standards, and there's a student handbook and they didn't publish that. I understand you did plead that, but I didn't read anywhere that they're actually publishing those standards saying here you go, here's something we promise to do every day. I believe it is in the complaint. I can look through the complaint and get you the library file to go look and see. In part we relied on the council standards which required that they be pleaded, that they be published. That's okay, counsel. I'll go back to the complaint. Okay. I don't want you to spend too much of your time looking for something. It is in RC-986 paragraph 64, RC-1071, criteria E1 to E3, and that is on page 5 of my brief. You're saying the paragraph of the complaint? Yes, 64 would be the paragraph, Your Honor. Okay. And that's off into the record, site 986, and then the criteria which required them to publish the standards are on RC-1071. Well, the standards require them to publish the rights and responsibilities. They don't require them to publish the standards themselves, though. I mean, tell me what you think of this. Some courts have looked at these standards and said that these are kind of like administrative regulations, right? These are these freestanding bodies out there. The Department of Education has said, we're not going to credit schools. You guys, we'll credit you or license you or delegate to you the power to then license these people. And so they set all these standards up, just like an administrative agency might set up standards for how an industry has to conduct itself. And then they determine, that body determines whether the individual schools are meeting the letter and spirit of the rules, right? Yes. I mean, these counsel standards aren't saying every school has to do everything exactly the same way. They're saying, here are the goals we're setting out, and we want you to comply with them, and we, the counsel, will decide whether you comply with them. They will say, we will decide whether to accredit you or not, which will be based on whether they are substantively following these rules. Substantively, but not necessarily identical. Not necessarily identical for purposes of accreditation. But I would treat these as, these regulations, as you would describe them, as incorporated by reference, just as in every contract, the law of Illinois is incorporated by reference into the contract. In this case, the counsel standards are incorporated by reference to explain and set out the rights of the student, and of all the stakeholders, of the institutional defendants, and of the patients as well, to the extent those standards go to patients or go to the institution. So that is the way in which I believe the standards are meant to be understood in light of the language of these standards, which talks about rights and responsibilities and explains what these rights are within the standards and explains what, for instance, especially in this case, a formative evaluation is. And therefore, we believe that these standards should be part of the implied contract and incorporated into the implied contract as a matter of law by reference. The trial judge thought that you were asking her to second-guess the decisions of the clinical instructors. Isn't that what a preceptor is, a person? Yes. Yeah. A preceptor is one of the instructors. Yes. So why was she wrong? She was wrong for several reasons on the law. First, as to the rule against review of academic judgments, courts generally do not apply that rule to procedural protections. So the rule against review of academic judgments comes from the idea that courts are not equipped to make a determination as to whether a student has properly completed his or her course of study in the technical aspects of that course of study. As to procedures, courts do that all the time. So, for instance, in Elliott v. University of Cincinnati, the student was supposed to be reviewed by five faculty members. There were only four. The court said, well, that's a breach of the implied contract. And so for procedural matters, courts are completely equipped to do that. And so in those cases, the rule or it's more of a presumption against academic a review of academic decision-making, courts have generally not applied that. And I cite a number of our sister courts from around the country who have held, look, if you don't follow the procedures, you've breached the implied contract. So that is the first basis. In this case, formative evaluations, as I've laid out in my brief, contain two components. One is a determination as to whether the student is capable of doing the work, the academic work. But the other requires procedures after that determination is made. And those procedures are we, as the instructors, have to try and figure out why the student is failing and at least make the attempt to get this student back on track to see if he can ultimately, he or she can ultimately be successful in the program. And that is a procedural protection for the student. And that should not be subject to the rule against review of academic decisions because it's not an academic decision. It's a procedural protection. Second, Illinois courts have held, and basically every court has held, that regardless of whether an instructor dresses his or her dismissal up as an academic decision, if it is made in bad faith or for arbitrary or capricious reasons, that is judicially reviewable and the courts will step in. So if an instructor or a university is lying or the decision is infected by bias, conflict of interest, or ill will, or is otherwise arbitrary and capricious, then the decision is reviewable by the courts. And in this case, not only did we plead that it was bad faith, arbitrary, and capricious, but on top of that, we gave facts which our sister courts have found to be evidence of bad faith, arbitrary, and capricious conduct, evaluating the student according to a different standard because of personal animus against that student. So in Maitland versus the Wayne State University Medical School case, the court in that case said, yeah, that's evidence of bad faith, and this is entitled to move forward. Evidence of personal ill will and bias, that's the Azevco case, and as well the Alcorn case, which was from Texas, which said, look, it's obvious that these university professors who gave this student his grades had knacks to grind against this guy. And we have a great deal of evidence to show that. And when it is apart from academic – when the decision is made and it's infected with something besides a determination as to that student's ability, that is judicially reviewable. And the Illinois appellate court has said that on multiple occasions in dicta, in Harris versus – in the Harris case, Harris versus Adler School. So if there's evidence of that, we will – we can review it. And the appellate – the court of claims who hears these University of Illinois cases and other state university cases say, if there's evidence of bias, conflict, or ill will, that is evidence of bad faith, and the case has to move forward. So those are two reasons which – where the judge on a 2615 motion – if this were after a trial, if this were on summary judgment, and she saw the evidence and said no reasonable fact finder could make this finding, then it would be a different story. On a 2615 motion, the trial court was required to draw inferences in my favor. I laid out evidence of that, and the trial court did not and drew inferences in favor of the other party. And that's where she misapplied – the jurisprudent court misapplied the law. Finally, as evidence of arbitrary and capricious conduct, under the Illinois standard, a departure from judgment, from professional judgment, is evidence of arbitrary and capricious conduct. And this is where the two standards overlap. When you ignore published procedures, when you ignore or you misapply the procedures which you are required to use, that is evidence of arbitrary and capricious conduct from which a fact finder can determine that there is a breach of the implied contract. So those are the three reasons why, on a 2615 motion, the Court was not – should not have misapplied the law as to whether the decisions of the institutional defendants were reviewable. One of the cases from our sister states, which I think is very important, is Morrison v. University of Oregon, where the equivalent of the preceptors, the instructors, did not grade the student according to proper procedures on a clinical, and the Court overturned that dismissal and found that that would be an invalidation that was an illegal determination and reversed it. And so there are cases from around the country which find that this could be an arbitrary and capricious conduct. Going into a couple of their defenses, one of the things they argue is that Brandon, the plaintiff had to have subjective knowledge of all of the documents that make up the implied contract. In Steinberg v. Chicago Medical School, the Supreme Court held that that is not the standard, that it is an objective standard from this type of implied contract, in fact, where the student should reasonably understand that when he or she applies and is accepted to a school, that that student must comply with the published documents. And on the flip side, the university should have to understand that in exchange for taking a tuition, it must comply with its published documents and published determinations and standards. For that reason, Mulvey v. Carl Sandburg, which the institutional defendants rely on heavily, is not on point because that actually wasn't even a contract case. That was a public secondary school, and so there would be no consideration. And in this case, this court must apply a Supreme Court precedent, which has been laid down. Turning to also as to the issue of exhaustion, there's no rule that for an implied contract, there's a need to exhaust administration. Okay, I won't go. You don't need to talk about that. Okay. Would you like to reserve a few minutes for rebuttal? I will. Do you want to wrap up? I don't want to completely cut you off. We're just getting started. Just as to DePaul University, the big issue there is most of their arguments as to agency. That is information within their knowledge, and therefore the Supreme Court has held that I don't have to plead that with specificity because it's not within my knowledge and because they are more than capable of preparing a defense and, if necessary, filing a 2619 motion. And in addition, if you're going to run a program, all of the instructors in that program are your agents for purposes of determining whether you follow the published documents and the accreditation standards in this case. And therefore, I ask that that argument, at least on 2615 motion, be rejected. All right? And as to the other counts, I'll stay on my brief by grace. Very good. We'll give you some time for rebuttal. Thank you. Again, good morning, Your Honors. And again, Jason Parson on behalf of North Shore University Health System and Tracy Felton and Julia Fezko. Your Honors, the big picture of this case is that Plaintiff was a student in nurse anesthesia, a very important, demanding, advanced practitioner degree. After obtaining a degree and passing a certification test, nurse anesthetists are empowered to administer anesthesia and monitor a patient's life functions throughout a surgery without a physician being in the room. The responsibility they undertake is sobering. I would submit it is awesome. The plaintiff in this case, it's important to understand, started in the North Shore program in September of 2010 and anticipated graduating in August of 2013, three years. In July 2012, which is near the completion of his second year, getting ready to start his third year, he was placed on a 30-day probation for numerous specifically articulated reasons which are set forth in Plaintiff's complaint. In his complaint, Plaintiff acknowledges that many of the criticisms of his performance were subjective, unverifiable. And I believe there's approximately nine that he articulates. For the remaining criticisms, he claims that they were distorted or grossly overstated or that the criticism was wrongful, which I'm not sure what that means legally. But he also says that many of them were wholly invented, right? He also says that certain ones, less than all. As a matter of fact, the minority of them were false or wholly invented. But, Your Honors, I have this very long complaint. When you review allegations other than these conclusory allegations, I believe that they reveal that Plaintiff does not allege that these incidents that were referenced in the criticisms were truly created out of whole cloth, but rather he disagrees with the characterization of the event. He says, for instance, that there was one event where he did not have, he was criticized for not having anesthesia equipment at the ready. And he says, well, that's absolutely not true. And I believe the retort that he says is that it was near enough to be at the ready. Despite the fact that the student, and despite the fact that the student handbook for the North Shore program, the student handbook, because we have more than one document that Plaintiff claims has contractual implications, says forth in multiple sections that there was a detailed, specific process for conflict resolution, complaint resolution, and appeals from probation. And that's mentioned in numerous places. Plaintiff did nothing to attempt to appeal the decision to place him on probation. In August 2012, he was placed on probation July 2012. He did nothing to challenge it then, these allegations that he claims are false. August 2012, his probation was reviewed and extended. He did nothing after that to say that these things were false or to challenge it through an established objective system that, by the way, the decision makers included, according to the handbook, which is part of the complaint, which is incorporated in the complaint and part of Plaintiff's allegations, whether he likes it or not, other nursing students would be part of the panel that made a decision. And in September 2012, when he claims he was confronted with the ultimatum to either withdraw or they were going to kick him out, he did not pursue his rights, which we don't dispute our rights under the handbook. Rather, some five years later, he files a lawsuit against North Shore University and his preceptors and his instructors, nurse Vetsville, claiming that his dismissal was wrongful and seeking damages for the dismissal. Plaintiff has asserted many theories of recovery. I suspect we won't get to them all today. In our argument, they're covered in our briefs. But the fundamental problem with all of his claims, not that they each don't have individual problems, is that they seek judicial review of an academic decision which is prohibited under Illinois law. But isn't he alleging that these preceptors didn't like him and they made up charges against him? Isn't that what this complaint says? Well, as I said, in some portions it says they made up charges, but in other portions of his own allegations, it suggests, well, I'm not saying that there wasn't anesthesia equipment and I'm not saying that it didn't occur, but what they said is far from what happened. Okay, but we're at the pleading stage, right? We are at the pleading stage. But Your Honors, just as the trial judge was similarly situated, are not stuck with his conclusory version of what the handbook says? No, that's true. Or of what these standards, which I agree with. But these allegations, he's saying that they didn't like him and because they didn't like him they made things up or grossly distorted things about him. He's saying this was not about my academic performance. This was about their malice and ill will against me. That's true, Your Honor. That is true. He's not saying they gave me a B and it should have been an A-. He's saying they made this stuff up, they railroaded it. He's saying they made some of the stuff up. He's not saying they had no base. Okay, let's go with some of the stuff. But if we get into what he is saying they made up, we are getting into, because he says that they're making it up, but out of the other side of his mouth he says, well, it's that they didn't provide to me these formative evaluations. They gave me evaluations. They listed evaluations in the probation notice. I've put them in my complaint, and I don't think these evaluations are formative evaluations. And once you're in that vortex of making that decision and a court trying to evaluate whether or not these formative evaluations really satisfy the academic definition of a formative evaluation, you are being pulled into exactly what the courts of Illinois have prohibited courts from doing, which is second-guessing, Monday morning quarterbacking academic decisions. This is in a situation where he wasn't given a hearing. This is in a situation where he wasn't given due process. He abandoned his opportunity for due process. This is a situation where he disputes what they said. And I submit, Your Honors, that he's got ten reasons that he mentions in his complaint. And he says, well, three of them are made up out of cold cloth. And although I don't agree with this, I believe his complaint reveals that, in fact, none of them were made out of cold cloth. His own words actually betray that none of them were made up out of cold cloth. But what if one was? Is that sufficient to ignore the nine or eight other reasons why that were documented, that he disagrees with because he thinks they were exaggerated? Is that sufficient to overcome those reasons if we kick out that reason? I submit, Your Honor, it's not. He alleges the procedure is not correctly followed. He's supposed to be provided with some opportunity for remediation with these consultations, and that because they did not follow procedure with the remediation opportunity, there's a procedure violation. The handbook, because we vehemently disagree that these counsel standards have anything to do and getting at a point anything to do with an agreement between him and the university. As a matter of fact, Your Honor asks, does he allege that these counsel standards were published? And his complaint does not allege that they were published. As a matter of fact, his complaint acknowledges, and the way he tries to hook the counsel standards in, is to say the handbook references the counsel standards. The handbook says we provide the course of study, the curriculum required to be accredited by this counsel. That's what it says, nothing else. And you don't have to take, again, his word for what the handbook says. It's in front of you. Now, insofar as Your Honor's specific question, does the handbook, did North Shore, did the program fail to follow the procedure for him to appeal these matters, the onus is on him. He claims, and this is important, Your Honor, because it's one of the very misleading aspects of his complaint. He claims that the handbook imposed upon his advisor the obligation to take him by the hand, this person who wants to be a nurse anesthetist and hold people's lives in his hands, and walk through a procedure which is on one page of the handbook as far as what the procedure is, and explain it to him. Underneath the heading of probation, it's there, what the specific procedure is. He says that the advisor from North Shore breached an obligation to point out to him that he had appellate rights and to counsel him that he had appellate rights and to advocate for him in front of the administration. And in fact, if you turn to the handbook and you say, and you look at the section on advisor as to what it says, it says that the student, and that's at the record specifically at C1003, that is the page that deals with the advisor's responsibility. It actually says under the advisor that the student has an obligation to make contact with the advisor quarterly to discuss clinical performance. The onus is on the student, not the advisor, to reach out. There is no mention whatsoever, not even implicit at C1003 or elsewhere, that the advisor has an obligation to advise a student of their appeal rights. There is no mention whatsoever that the advisor has an obligation to provide feedback related to performance. There is no reference, implicit or otherwise, anywhere, that the advisor has an obligation to advocate for the student. If you want to discuss something that's made out of whole cloth, according to the handbook that it's cited, look at the handbook. Look at the allegations in plaintiff's complaint as to what the handbook says, according to him, versus what it actually says. And look at the allegations in the complaint regarding what the COA standards say versus what they actually say. Does he need to plead a violation of standards or handbook violations instead of claiming? Well, those are nice people. You don't need any of those things, do you? It's the basic implied tuition contract. It's if you come to my school, I take your money, and you do the work, I promise you a degree or advancement towards a degree. You don't need a degree, right? He actually has to plead more, Your Honor, because that's not what this case is about. This isn't a case, unlike the other ones he cites, where somebody did the work and passed the classes and wasn't given a degree. One of the cases he cites, that's what happened. Well, sure, but he's saying he was stopped short of it. He wanted to. He's saying you guys evaluated me unfairly. That's what he's saying. But you keep saying words like unfairly. He's saying you made things up about me. You didn't like me and you didn't judge me based on my performance. You judged me. You ran me out of the program. I mean, isn't that what the complaint is about? He's saying you made up certain things about me. I will concede that I cannot. He concedes. I cannot state that these other things you said in criticism of me are false. As a matter of fact, he says they're subjective and he can't change anything. Do you think that he is alleging bad faith, ill will, and malice? Well, according to the Illinois decisions that deal with review of academic decisions, the Illinois decisions which we have cited in our case. And those were 2-6-15 cases? Or were they summary judgment or trial cases? As I stand here today, Your Honor, I'm not certain. I'm not certain. I don't see a lot of 2-6-15 decisions in this area. I see a lot of summary judgments and I see some after trial. I understand, Your Honor. I will make reference to the cases and I apologize. I don't apologize. I stand here. In Frederick v. Northwestern University Dental School, 1st District, 1993, allegations that a student's professors had animus or bias against him are insufficient to allege arbitrary and capricious conduct. In Race v. Aurora University, 2nd District, 2004, there was a failure to adequately document deficiencies in performance by the school. There was a failure to warn of alleged deficiencies by the school. There was a failure to follow the field instruction manual that the school published. And that court said this is not arbitrary and capricious under this area of law. University liability for breach of contract only exists if the university did not exercise its academic judgment at all. The failure to exercise judgment is arbitrary and capricious because once you get into the universe of how they exercise your judgment, you're engaging in the process that the courts have already said is a syllabary slope that judges and lawyers don't belong in. Medical professionals and teachers are peculiarly qualified to conduct those inquiries. I'm not sure how many. Yeah, are you going to evenly split this? We said we would, and so I guess... If that's the plan, then maybe we should. All right. We stand on our brief regarding the remaining arguments. Thank you very much. Do our best to give you time. Thank you, Your Honor, and good morning again. Good afternoon. Good afternoon. Again, my name is Karen Kortu on behalf of DePaul University. The court should affirm the trial court's dismissal because, as the accountants' own allegations show, Northshore dismissed him from his nurse anesthesia program for serious and persistent deficiencies in the area of patient safety. That conduct simply cannot amount to a breach of contract in the academic context. In applying the arbitrary and capricious standard that courts apply to breach of contract claims in the academic context, courts have held that they will find arbitrary and capricious conduct only where there is no discernible rational basis for the academic decision. As several courts have put it, that's a heavy burden, and it's even heavier where a university is responsible for awarding a medical degree because the university is, in effect, certifying that the student will be able to safely serve the public, and so the level of deference afforded in the medical context is even higher. But is it exercising professional judgment to make up things about someone because you don't like them? Your Honor... Isn't that what they're pleading, the absence of professional judgment here? The allegations in the complaint where the plaintiff says he was, that a certain criticism was wholly invented, it's difficult to understand how that could possibly be because what his supervisors were really evaluating was whether he was administering anesthesia properly, whether he was properly organized, whether he was able to track his cases as they went along and multitask and think critically. Are you staying within the four corners of the complaint when you're saying that? Absolutely. That comes straight from paragraph 51, Your Honor. Those are some of the reasons for which he was written up, and those reasons, I don't know how those could possibly have been fabricated or falsified when they're the subjective judgments of the medical faculty who had been charged by the university with evaluating him. So what we have at base is a student who is disagreeing with the characterizations or the subjective evaluations of his clinical performance, and that is historically something that it's well-established courts will not evaluate in Illinois, or really anywhere, but particularly in Illinois. And so his own allegations show the rational basis for his dismissal. They also show that, unlike cases where there is arbitrary and capricious conduct according to the courts, North Shore was not abdicating from exercising its academic judgment as required under, for example, United States v. Ewing. It was exercising that academic judgment. And in that effect, it means that we're in the province of decisions that the court should not be second-guessing. I would point the court to a case called Harris v. Adler. I think we've referred to it already. That is a 2-615 case where the court determined that there were allegations of arbitrary and capricious conduct in the form of an invalid Ph.D. exam. I mean, that required the court, on the face of the complaint, they were asking the court to say that this exam did not adequately test somebody on a year's worth of education. I mean, that is exactly what courts do not do, right, is to jump in and say, well, we don't think this test was good enough. We should have written a better test to cover the coursework. I mean, the judge has no business doing that, right? And that's a 2-615 case. It should have been a 2-615 case. But here he's alleging, Mr. Bosh is alleging, that people ran him out of the program. I mean, they're saying they didn't like him and they made things up about him. You know, is that going to be tough for him to prove? Yeah, very tough. But does he state a claim? I mean, how does that not at least get you into the area of malice and ill will? Because for him to prove that will require the court to make judgments about whether the clinical faculty's evaluations of him were accurate or not. Maybe. Maybe not. I mean, how do we know? I mean, if he's saying he made something up, the court can figure out if somebody made something up. I mean, you're right. I mean, if it comes down to should he have gotten a C-plus or a B-minus, yeah, the court's going to, Mr. Bosh, still lose. And that may be very well what happens. But at this stage, are we able to just jump right to that conclusion on that 2-615? Well, there's another problem as well, Your Honor, which is that the plaintiff alleges a, quote, unquote, personality conflict. He makes liberal use of terms like falsification, fabrication, wholly invented. But those are all conclusions and not specific facts. He has had three bites of the apple, and he has not fled any specific facts detailing the basis for his belief that there was a personality conflict, how it was manifested, what was he doing in a certain case when he was written up for, let's say, not having surgical tools at the bedside. Why aren't those specific facts in the case on a second amended complaint? If we strip away all of the conclusions and characterizations from his allegations, we are left with an essential academic issue that the court's ill-equipped to address, as Judge Brennan correctly pointed out at the trial court level. And so even the cases that were decided at a summary judgment level or at the trial level are helpful to us in this analysis because they, first of all, reaffirm the arbitrary and capricious standard, and they also demonstrate that there are – there was conduct similar to what plaintiff has alleged that was not found to have been arbitrary and capricious. For example, I would point to Billett v. Northwestern, where there were some allegations that actually were proven through the course of the exchange of evidence, and the court found even though there was, let's say, proven use by one of the faculty members of the plaintiff's work or a personal relationship, personal animus between the plaintiff and one of the faculty members who was evaluating her, it still didn't rise to the level of arbitrary and capricious. And so in this case, there's no need to go through the discovery process to get to a point where we already know how it's going to turn out, that there wasn't arbitrary and capricious conduct. Furthermore, even if this court finds that the appellant has pled sufficient allegations of arbitrary and capricious conduct, which has not, to support a breach of contract claim against North Shore, the plaintiff still has not pled enough to support any liability on the part of DePaul University. None of the conduct at issue was done by DePaul. Plaintiff had finished DePaul's part of the program, which was the classroom courses, and moved on to North Shore's part of the program. Plaintiff's work was supervised and evaluated by North Shore. But he couldn't get a degree from DePaul unless he completed the North Shore, right? It's correct that he... To get this joint degree, you had to complete the joint program. You relied on each other's... You know, North Shore was relying on you, saying he did the academic part, and you were relying on North Shore, but he did the clinical part, right? That's correct. And now you're saying, oh, no, we're completely different? Well, it was two separate sections of the program. That's pled clearly in the complaint, and he had finished the DePaul part. Furthermore, plaintiff didn't attach a DePaul handbook. There's only a North Shore handbook attached to the complaint, and a review of that handbook shows that DePaul had very little, if any, role in North Shore's administration of the clinical component of the program, let alone the type of control that would be required under either of his theories, agency or joint venture. There are no allegations of any contractual duties falling to DePaul with respect to the clinical portion of the program. And the conduct that's the heart of this is supervision, evaluation, placement on probation, and dismissal. There are no allegations that DePaul had any role in any of that conduct. And so for those reasons, there are insufficient factual allegations to support any of the plaintiff's theories for imputing the conduct of North Shore, as he alleges it, onto DePaul University. Appellants' remaining claims against DePaul, which are for fraud and scoliation, also fail. As we've extensively briefed, the plaintiff failed to meet the heightened pleading standard required for fraud. He doesn't specify what false representations he's referring to, what they said, where they were printed, when he accessed them, or who made them. Likewise, scoliation, besides not being a cause of action in Illinois, is a particularly absurd claim to make against DePaul, when the records that he's seeking and claims to have been exfoliated were records that DePaul could never have had its hands on in the first place. And so in sum, Your Honor, the allegations in the complaint themselves demonstrate that North Shore exercised academic judgment in the serious context of anesthesia during medical procedures, that the plaintiff was dismissed because of his documented and persistent clinical deficiencies, and that therefore North Shore's conduct was not arbitrary and capricious, nor is there a basis for imputing liability for North Shore's conduct to DePaul. And so for the third time, the plaintiff has failed to plead facts in supporting a breach of contract claim or any other claim against DePaul, and the court should uphold the trial court's dismissal. Thank you. Thank you. Mr. Selkin? Yes, Your Honor. I think when you were finishing up, you were starting to talk about exhaustion a little bit, and I'd cut you short just because you were a little low on time, but I think that one of your adversaries was harping on that a bit. Do you want to address that? Sure. Well, first off, exhaustion is supposed to be brought as a 2619 motion. So if you look at Burns v. Illinois Department of Insurance, they should present affirmative manner of failure to exhaust and what that would have achieved, and the burden is on them to prove it, and then we could have done discovery on the 2619 and it would have been or on a summary judgment motion, and at that point we could then sort of suss out whether exhaustion would be effective. Do you have to plead that you exhausted your administrative remedies? Pardon? Do you have to plead that in a complaint? No, you do not. Is that a precondition? No. There's no – first off, as a matter of law, there's been no case in Illinois that has ever held that for an implied tuition contract you have to exhaust. So there's – Johnson v. Christian Legal College sets out what I had to plead, and as an affirmative defense, exhaustion should be pleaded by them and proved by them. So first there's that. Second, a point I make is that if you breach the contract before at some point, which we argue the institutional defendants did, that generally puts an end to the other party having to do anything. That once a contract is materially breached, then that puts an end to the matter for the plaintiff for matters of performance. So the point I make is that if you breach the contract before at some point,  And that's true of the other contract. Goldstein v. Lustig holds that, and that's general sort of black-letter contract law. And the problem here is by most problematically. So first, they damage the record by putting a number of false allegations about my client into the record and false charges about my client in the record. But second, by completely messing up the formative evaluation process, That's not something that can actually be fixed moving forward, because the idea behind a formative evaluation process is the preceptor determines the problem and then finds, tries to find ways to teach the student and bring the student up to speed. But by screwing up the formative evaluation process, well, it may be at the end, and we don't concede this, but it may be at the end that he really couldn't have, couldn't do this job. But on the other side of it, he could have done the job, maybe, if the formative evaluation process had been properly carried out and his alleged flaws were addressed by the preceptors and by the program generally. So when exhaustion wouldn't help, and this is something that would come out on a 2619 motion, whether it would or it wouldn't, and it would be on their burden to prove, when it wouldn't help, it's black-letter law that a party doesn't need to exhaust, even if there was some requirement for us to exhaust, and there isn't. You don't have to undertake these procedures. They are, as Mr. Parsons said very loudly and very continuously, that these are voluntary procedures. So it's not as though he has to do them. They are not a conditioned precedent to him, to Mr. Bosch, bringing a breach of contract claim. So for purposes of exhaustion, those are the points we would make and argue. In the complaint, there's a lot of talk about conclusions. But a fact is something which is an evidentiary fact. First off, I only have to plead ultimate facts to get past the cleaning stage. But an evidentiary fact is one which you can directly perceive. If my client, if they say he didn't manage, if he didn't properly use the anesthesia equipment, and my complaint says, no, he did, that's false, that's an evidentiary fact. That's not a conclusion. Either the anesthesia equipment was there or it's not. We're saying it's not. They're saying it is. That's an evidentiary fact. And then as to matters of academic judgment, again, we point out that we can, we should have the ability to try and prove that this stuff was made up, that these allegations were made up by showing unequal treatment, by impeaching the witnesses in discovery or in depositions. This would be a very different case if there was a record full of depositions and there was no evidence showing that, no objective evidence showing that there could be a fact issue here. But right now, the inferences have to be drawn in my favor and they're basically making closing arguments to a jury to you. And that's not what a court should be doing on a 2615 motion. The briefs go through extensively about the facts that were pleaded and they keep going back to these things, but a reasonable trier of fact could look at that complaint and look at the allegations in the complaint and draw an inference of that thing. And that's what the court below had to do and that's what the court at this stage, that's the standard that I need to be, that I should be held to under Illinois law. Okay, counsel. Thank you very much. The briefs were very well done and so were your arguments today. We appreciate your time. It's a difficult case. We will take it under advisement and stand adjourned. Thank you.